Alison E. Chase (SBN 226976)
achase@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

*Attorneys for Plaintiffs*

*Additional Counsel Listed on Signature Page*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| OneroRx, Inc., individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>  v.<br><br>GoodRx, Inc.; GoodRx Holdings, Inc.; CVS Caremark Corp.; Express Scripts, Inc.; MedImpact Healthcare Systems, Inc.; and Navitus Health Solutions, LLC,<br><br>       Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**Violations of the Sherman Act**<br><br>**Jury Trial Demanded** |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................1

II.   JURISDICTION AND VENUE..............................................9

III.  PARTIES............................................................................11

IV.   FACTUAL ALLEGATIONS...............................................14

    A.    The Role of Pharmacy Benefit Managers in Price-Setting and Market Consolidation............................................................14

        1.    The Pharmaceutical Supply and Payment Chains.................14

        2.    PBM Pharmacy Networks.......................................................17

        3.    Pricing Benchmarks.................................................................19

            a.    Federal Framework ......................................................21

            b.    Private Framework........................................................22

    B.    The Market Dominance of Pharmacy Benefit Managers.................26

        1.    The Rise of PBMs in the Pharmaceutical Supply Chain........26

        2.    The Current Size and Role of PBMs in the Pharmaceutical Supply Chain .............................................27

        3.    PBMs' Market Dominance and Vertical Integration .............31

        4.    Background on Pharmacy Benefit Manager Misconduct.......35

            a.    Spread Pricing................................................................35

            b.    Clawbacks ......................................................................40

            c.    Policy and Legal Scrutiny of PBM Practices...............40

        5.    PBMs' Disproportionate Bargaining Power and Its Effects on Independent Pharmacies........................................41

    C.    Traditional Prescription Discount Cards and Pharmacy Savings Clubs ....................................................................................46

        1.    Voluntary Discounts for Uninsured Patients .........................46

i

2.      GoodRx's Original Model ....................................47

3.      Pharmacy Push Back ........................................48

4.      Setting Stage for the ISP Pivot ...............................49

D.      The GoodRx ISP Scheme ........................................50

1.      ISP Steps..................................................51

2.      GoodRx's Public Announcement of the ISP Scheme and
        Partnerships ..............................................53

E.      Direct and Indirect Evidence of an Unlawful Horizontal
        Conspiracy....................................................57

1.      Direct Evidence of a Horizontal Price-Fixing Agreement .....57

2.      Indirect Evidence of a Horizontal Price-Fixing
        Agreement ................................................58

F.      Relevant Markets ..............................................62

G.      Anticompetitive Effects and Injury to Class Members ...................63

V.    CLASS ACTION ALLEGATIONS............................................68

VI.   CAUSES OF ACTION ....................................................70

COUNT ONE — ....................................................70

      Agreement in restraint of trade in violation of section 1 of the sherman
      antitrust act (15 u.s.c. § 1)...........................................70

VII.  PRAYER FOR RELIEF....................................................73

VIII. JURY DEMAND..........................................................74

Plaintiff OneroRx, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants GoodRx, Inc.; GoodRx Holdings, Inc. (together with GoodRx, Inc., "GoodRx"); CVS Caremark Corporation ("CVS Caremark"); Express Scripts, Inc. ("Express Scripts"); MedImpact Healthcare Systems, Inc. ("MedImpact"); and Navitus Health Solutions, L.L.C. ("Navitus"), and alleges the following based upon personal knowledge, information and belief, and upon the investigation of counsel:

## I.    INTRODUCTION

1.    This case concerns an unlawful horizontal price-fixing agreement between GoodRx and four of the largest pharmacy benefit managers in the United States—CVS Caremark, Express Scripts, MedImpact, and Navitus (collectively, the "PBM Defendants"). Through its so-called Integrated Savings Program ("ISP"), GoodRx and the PBM Defendants have orchestrated a horizontal price-fixing agreement by coordinating the exchange of competitively sensitive information and enforcing a single, uniform "lowest negotiated rate" for every generic-drug claim. This lower rate has substantially damaged Plaintiff and the Class, as Defendants have artificially suppressed the prices paid to independent pharmacies for reimbursement of generic prescription drug claims.

2.    Pharmacy benefit managers ("PBMs"), including the PBM Defendants, contract with pharmacies on behalf of health plans, employers, and other third-party payors (collectively, "TPPs"). They negotiate the prices that third-party payors and health

insurance plans pay pharmacies for generic prescription drugs and process the pharmacies' reimbursement claims based on those pre-negotiated prices. Through the ISP, GoodRx essentially embeds itself into the claims-processing systems of the PBM Defendants, effectively setting each PBM Defendants' reimbursement rate for generic prescription drugs. The PBM Defendants, who are horizontal competitors with each other, each knowingly agreed to participate in GoodRx's ISP. By so agreeing, the PBM Defendants, in effect, agreed to not outbid one other on pharmacy reimbursement rates for generic medications. This unlawful conduct is herein referred to as the "GoodRx ISP Scheme," "ISP Scheme," or "Scheme."

3.    The PBM Defendants—CVS Caremark, Express Scripts, MedImpact, and Navitus—are among the largest and most influential pharmacy benefit managers in the United States. Collectively, they process a vast majority of prescription claims and wield enormous leverage over pharmacies, third-party payors, and ultimately consumers.

4.    Historically, PBMs charged a flat administrative fee for their services. But approximately two decades ago, they switched to a model where they received a percentage of the price of a drug. Not surprisingly, this has led to a fundamental conflict of interest. Rather than acting in the best interests of those they contract and deal with, the PBM Defendants are now money-making machines extracting outsized shares for themselves at nearly every step of the pharmaceutical supply chain.

5.    GoodRx provides a platform that aggregates PBM-negotiated reimbursement rates for generic drugs and makes those rates available to users of the GoodRx discount

2

card who pay cash for their prescriptions. Nearly every pharmacy benefit manager in the country, including the PBM Defendants, has agreed to share their individually negotiated reimbursement rates directly with GoodRx for use in connection with the GoodRx discount card. With the GoodRx discount card, if an individual elects to pay cash at the pharmacy for their prescription medication, they get the benefit of the PBM-negotiated drug price, even without a health insurance plan. The PBM whose negotiated rate was applied to the transaction collects a fee from the pharmacy, which it then shares with GoodRx. By allowing customers to purchase prescription drugs at the lowest-negotiated rate, the GoodRx discount card cuts dramatically into the margins of independent pharmacies. Consequently, many pharmacies have stopped accepting the GoodRx discount card.

6.     The GoodRx discount card is not directly at issue in this action. Rather, this action concerns the GoodRx ISP Scheme, which hinges on the unlawful use of the competitively sensitive information—the PBM-negotiated reimbursement rates—shared with GoodRx in connection with its discount card.

7.     In the absence of the price-fixing agreement alleged here, the PBM Defendants would have to compete with one another to get pharmacies to join their respective networks of preferred pharmacies. Because the value and appeal of a health plan is determined, in large part, by how expansive a plan's pharmacy network is, the PBM Defendants have an undeniable interest in securing contracts with pharmacies. The

PBM Defendants negotiate contract terms with independent pharmacies, including, critically, the reimbursement rates they will pay for generic prescription medications.

8.    The ISP Scheme effectively negates any need for these negotiations by fixing the reimbursement rate across all PBM Defendants. Since at least January 1, 2024, the PBM Defendants and GoodRx have participated in the ISP Scheme. GoodRx contracts with the PBM Defendants to embed its pricing technology into their claims-processing systems. The PBM Defendants gain access to competitors' confidential rate data through this technology, enabling collusion to suppress reimbursements.

9.    Put differently, the PBM Defendants outsource their pharmacy reimbursement decisions to GoodRx, which employs a proprietary computer algorithm to aggregate real-time pricing data from rival PBMs. This algorithm identifies the lowest reimbursement rate negotiated by any PBM in GoodRx's network and automatically applies it to pharmacy reimbursement claims processed by the PBM Defendants. For each claim processed through the Scheme, the PBM Defendant pays the pharmacy the algorithmically-determined lowest rate negotiated by any PBM in GoodRx's network.

10.    By automatically routing each prescription through the PBM offering the lowest rate, the Defendants ensure that they are paying pharmacies only the rock-bottom price for every generic drug transaction. Critically, the Defendants further ensure that Plaintiff and the Class are receiving the lowest possible price for every transaction by agreeing to never outbid one another.

4

11.     GoodRx, in its public disclosures, all but admits to this price-fixing agreement. According to GoodRx, the ISP Scheme allows individuals to have "automatic access to GoodRx's prescription prices." When an individual presents their prescription card at the pharmacy, using a "behind-the-scenes pricing tool," the "integrated savings program (ISP) automatically compares offerings and routes insured consumers to whichever eligible price is lower for their medication, the GoodRx price or the insurance price, and applies it to their deductible." This "GoodRx price" is "based on the lowest available price from our network of PBMs for that pharmacy location or the contracted retail-direct price."[1] In other words, through the ISP, pharmacies are reimbursed not based on the rates they negotiate with a particular PBM on behalf of a particular TPP, but instead, based on the lowest rate negotiated by any PBM in GoodRx's network on behalf of any TPP.

12.     The PBM Defendants profit under the ISP Scheme in three key ways. First, the PBM Defendants profit by paying less in reimbursement rates for generic prescription medications than they otherwise would in a truly competitive market, without the risk that pharmacies will no longer be part of their preferred pharmacy networks. Second, the PBM Defendants profit from fees charged to the pharmacies on a per-claim basis. For each prescription paid pursuant to the ISP Scheme, GoodRx charges the pharmacy a "processing fee" or "clawback," which it then shares between itself, the customer's PBM,

---

[1] *Investor Presentation*, GoodRx (Feb. 2025), https://investors.goodrx.com/static-files/f31a5842-9748-4849-9b67-9db94fa6eab7.

5

and the PBM whose negotiated rate was applied to the transaction. And third, by funneling fee payments through GoodRx, the PBM Defendants also avoid contractual bans on "spread pricing." They shift the difference between what payors pay and what pharmacies receive onto GoodRx, which then redistributes it to the ISP participants.

13.    GoodRx profits by collecting a portion of the fee charged for each prescription dispensed pursuant to the ISP Scheme. On information and belief, GoodRx earns approximately $5 per transaction made pursuant to the ISP Scheme. And, by embedding itself within the PBM Defendants' claims processing systems directly, GoodRx profits regardless of whether a particular pharmacy chooses to work with GoodRx. Unlike with the traditional GoodRx discount card, a pharmacy has no choice but to transact with GoodRx, so long as it is in network for one of the PBM Defendants. In other words, the ISP Scheme offers pharmacies a Hobson's choice—either accept the suppressed reimbursement rates under the ISP Scheme or lose the business of 64% of the PBM services market.[2]

14.    In summary, the GoodRx ISP Scheme compels the PBM Defendants to adopt a single, uniform reimbursement rate—the lowest negotiated among all pharmacy benefit managers in GoodRx's network—for every generic prescription. Moreover, by imposing retroactive clawback fees, GoodRx further undermines independent pharmacies by ensuring they consistently receive amounts below market value. By integrating

---

[2] As set forth in more detail below, these PBM Defendants serve nearly two-thirds of the market.

directly into the PBM Defendants' internal claims-processing infrastructure, GoodRx institutionalizes centralized algorithmic price-fixing and facilitates collusion among the PBM Defendants. This is a textbook price-fixing scheme that has damaged Plaintiff and the Class.

15.     GoodRx knows that its ISP Scheme significantly reduces independent pharmacies' ability to stay profitable. Yet it continues to leverage this network to enrich itself and its PBM co-conspirators at the expense of pharmacies and the communities they serve. GoodRx abuses its access to PBMs' proprietary data, colluding with the PBM Defendants to fix reimbursements at the lowest negotiated rate. As a result, independent pharmacies, which rely on fair and competitive rates to stay in business, suffer crippling losses. The ISP Scheme has undeniably worsened existing financial pressures on independent pharmacies, accelerating the decline of local pharmacy access and deepening pharmacy deserts in underserved areas.

16.     The independent pharmacies in Plaintiff OneroRx's network and other similarly situated independent pharmacies have suffered significant monetary losses and are threatened with closure. Despite attempts to opt out of transacting with GoodRx and/or negotiate fair terms with the PBM Defendants, independent pharmacies remain captive to the Defendants. Indeed, six pharmacy benefit managers process more than 90% of prescriptions dispensed by U.S. pharmacies. The PBM Defendants account for approximately two-thirds of that amount. Plaintiff has experienced firsthand the drastic

impact of GoodRx's price-fixing practices. Plaintiff's reimbursement rates have been unilaterally lowered by the ISP Scheme.

17.    Operating 67 independent pharmacies in seven states, Plaintiff OneroRx provides integrated, quality pharmacy care to underserved communities across the Midwest. In total, Plaintiff OneroRx provides critical pharmacy services to over 750,000 patients each year. In addition to providing members of its communities with immunizations, telepharmacy services, prescription counseling, medication delivery, and medical equipment, the pharmacies within Plaintiff OneroRx's network have filled over four million prescriptions since January 1, 2024, many of which were for generic prescriptions subject to the ISP Scheme. On information and belief, since January 1, 2024, over 20,000 of these prescriptions were processed under an Integrated Savings Program. For each claim processed under the Integrated Savings Program, pharmacies in OneroRx's network were required to pay additional transaction fees, in addition to receiving artificially reduced reimbursement payments.

18.    Upon information and belief, for these transactions, customers presented their normal health insurance card at the pharmacy counter at point of sale. The reimbursement claims submitted by Plaintiff, however, were routed not to the customer's pharmacy benefit manager, but to the pharmacy benefit manager with the lowest-negotiated reimbursement rate for the purchased prescription. For each prescription filled, Plaintiff OneroRx receives a claim summary. For prescriptions filled pursuant to the ISP Scheme, the claims summary may contain the notation "GDRX" following the six-digit

Bank Identification Number ("BIN") of the pharmacy benefit manager that the claim was routed to. For example, between January 30, 2025 and April 24, 2025, Plaintiff has identified at least 250 claims with the notation "GDRX" that were processed subject to the ISP Scheme. The "GDRX" notation appears on some, but not all, of the claims processed pursuant to the ISP Scheme. On information and belief, Plaintiff has been charged a processing fee for each claim processed under the ISP Scheme.

19.    The Scheme violates Section 1 of the Sherman Act: it is the means by which the PBM Defendants have conspired to fix prices for pharmacy reimbursement. The Scheme also unlawfully allows the PBM Defendants to circumvent state and contractual bans on spread pricing. Furthermore, this conspiracy eliminates any competition between the PBM Defendants for pharmacy network participation.

20.    Plaintiff brings this action to stop GoodRx's anticompetitive scheme, to recover damages for the losses sustained by independent pharmacies, and to ensure that GoodRx and its PBM co-conspirators cannot continue to exploit the market for network pharmacy services. Plaintiff seeks, among other remedies, treble damages under federal antitrust law and injunctive relief prohibiting further collusive conduct.

## II.    JURISDICTION AND VENUE

21.    This case arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

22.    The Central District of California has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), and pursuant to 15 U.S.C. § 15 because this

action alleges violations of the Sherman Act. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the proposed Class is a citizen of a different state than that of the Defendants.

23.    The Central District of California has personal jurisdiction over Defendants. Each Defendant: (1) transacts business in California; (2) maintains substantial contacts in California, and (3) committed the violations of federal law at issue in this action throughout the United States, including within the State of California. This action arises out of and relates to the GoodRx ISP Scheme, which was directed at, and had the foreseeable and intended effect of, causing injury to persons and businesses, including Plaintiff, residing in, located in, and/or doing business in the United States, including within the State of California. The Central District of California also has personal jurisdiction over Defendants GoodRx, Inc. and GoodRx Holdings, Inc. because both Defendants have their principal places of business in this District.

24.    Each Defendant purposefully availed itself of the privilege of doing business within California and each derived substantial financial gain from doing so. These continuous, systematic, and case-related business contacts—including the tortious acts described herein—are such that each Defendant should reasonably have anticipated being brought into the Central District of California.

25.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391, because each Defendant transacts business in, is found in, and/or has agents in this

District, and because a substantial part of the events giving rise to this action took place, or had their ultimate injurious impact, within the Central District of California. Venue is also proper in the Central District of California pursuant to 15 U.S.C. § 22, because each Defendant transacts business in and/or is found in this District.

## III.   PARTIES

26.     Plaintiff OneroRx operates 67 independent pharmacies located in Illinois, Indiana, Iowa, Michigan, Missouri, Nebraska, and Wisconsin. Plaintiff OneroRx, formerly National Telehealth Solutions, has been providing critical health care services to underserved communities since 1990. In addition to dispensing millions of prescriptions annually, Plaintiff provides immunizations, telepharmacy services, prescription counseling, medication therapy management, and medical equipment. Plaintiff OneroRx is committed to providing personalized, integrated pharmacy services to its patients, contributing not only to the health of its patients, but to the greater welfare of its communities.

27.     Defendant GoodRx, Inc. is a Delaware corporation with its principal place of business in Santa Monica, California.

28.     GoodRx, Inc. is a wholly-owned subsidiary of GoodRx Intermediate Holdings, LLC, which is itself a wholly-owned subsidiary of GoodRx Holdings, Inc. At all relevant times, GoodRx, Inc. was engaged in business in this District and throughout the United States.

11

29.     Defendant GoodRx Holdings, Inc. is a Delaware corporation with its principal place of business in Santa Monica, California.

30.     At all relevant times, GoodRx Holdings, Inc. was engaged in business in this District and throughout the United States.

31.     Defendant CVS Caremark Corporation is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island. Defendant CVS Caremark Corporation is a subsidiary of CVS Health Corporation.

32.     At all relevant times, CVS Caremark Corporation was engaged in the business of providing pharmacy benefit management services, including negotiating and managing reimbursement rates and pricing strategies that affected independent pharmacies, resulting in reduced reimbursement amounts paid to these pharmacies.

33.     CVS Caremark Corporation transacts business in this District and throughout the United States.

34.     Defendant Express Scripts, Inc. is a Delaware corporation with its principal place of business in St. Louis, Missouri. Express Scripts, Inc. is a wholly owned subsidiary of The Cigna Group.

35.     At all relevant times, Express Scripts, Inc. was engaged in the business of providing pharmacy benefit management services, including negotiating and managing reimbursement rates and pricing strategies that affected independent pharmacies, resulting in reduced reimbursement amounts paid to these pharmacies.

36.     Express Scripts transacts business in this District and throughout the United States.

37.     Defendant MedImpact HealthCare Systems, Inc. is a California corporation with its principal place of business in San Diego, California.

38.     At all relevant times, MedImpact was engaged in the business of providing pharmacy benefit management services, including negotiating and managing reimbursement rates and pricing strategies that affected independent pharmacies, resulting in reduced reimbursement amounts paid to these pharmacies.

39.     MedImpact transacts business in this District and throughout the United States.

40.     Defendant Navitus Health Solutions, LLC is a Wisconsin limited liability company with its principal place of business in Madison, Wisconsin. Navitus is wholly owned by SSM Health.

41.     At all relevant times, Navitus was engaged in the business of providing pharmacy benefit management services, including negotiating and managing reimbursement rates and pricing strategies that affected independent pharmacies, resulting in reduced reimbursement amounts paid to these pharmacies.

## IV.    FACTUAL ALLEGATIONS

**A.    The Role of Pharmacy Benefit Managers in Price-Setting and Market Consolidation**

**1.    The Pharmaceutical Supply and Payment Chains**

42.    Pharmaceutical products originate in manufacturing sites, are sold to wholesale distributors at a discounted rate, and are subsequently marked up by wholesalers and sold and stocked at retail, mail-order, and other pharmacies. Pharmacies, including independent stores like Plaintiff, then dispense prescription medications to beneficiaries for consumption.[3]

43.    The payment chain, however, is exponentially more complex, and pharmacy benefit managers, including the PBM Defendants, are embedded in nearly every stage. The technical function of a pharmacy benefit manager is to administer a health coverage provider's prescription drug program. A pharmacy benefit manager develops the coverage provider's drug formulary, processes claims on behalf of covered beneficiaries, creates a network of retail pharmacies that provide discounts in exchange for access to a provider's plan participants, and negotiates with pharmaceutical manufacturers. In doing so, pharmacy benefit managers contract with drug manufacturers, health plans, and pharmacies.

---

[3] Health Strategies Consultancy LLC, Henry J. Kaiser Family Found., FOLLOW THE PILL: UNDERSTANDING THE U.S. COMMERCIAL PHARMACEUTICAL SUPPLY CHAIN (Mar. 2005), https://www.kff.org/other/report/follow-the-pill-understanding-the-u-s/.

44.    The following figure shows how funds, products, and services typically move among drug manufacturers, PBMs, health plans, plan sponsors, drug wholesalers, pharmacies, and beneficiaries. This figure does not capture every relevant relationship or entity. It also does not fully depict the vertical integration that exists among these players.

**Conceptual Model of the Flow of Products, Services, and Funds for Non-Specialty Drugs Covered under Private Insurance and Purchased in a Retail Setting.[4]**



45.    Of particular significance here are the pharmacy benefit managers' contractual relationships with retail and community pharmacies. Pharmacy benefit managers are hired by TPPs to administer and provide prescription drug benefits to the TPPs' beneficiaries. In this role, pharmacy benefit managers negotiate and contract with pharmacies on behalf of TPPs. The pharmacy benefit managers negotiate the prices TPPs and their beneficiaries pay for prescription medications. At the point of sale, pharmacies

---

[4] Neeraj Sood, et al., *Flow of Money Through the Pharmaceutical Distribution System*, USC Schaeffer Ctr. for Health Pol'y & Econ (June 2017), https://healthpolicy.usc.edu/research/flow-of-money-through-the-pharmaceuticaldistribution-system/.

collect a payment directly from customers, often based on the individuals' health insurance plan. TPPs, on behalf of their covered beneficiaries, will then pay their pharmacy benefit managers for the prescriptions. Pharmacy benefit managers then process pharmacies' claims for reimbursement based on these negotiated prices and reimburse pharmacies for the prescriptions dispensed, leaving pharmacies with minimal profit—or even a loss.

46.     Many pharmacy benefit managers contract with independent pharmacies by way of contracts with groups called Pharmacy Services Administrative Organizations ("PSAOs"). PSAOs act as a collective bargaining group for independent pharmacies and negotiate with pharmacy benefit managers on the pharmacies' behalf. In return, independent pharmacies pay PSAOs a monthly fee. These negotiations include pharmacies' reimbursement rates and dispensing fees. Much like pharmacy benefit managers, PSAOs are a highly consolidated industry – it is estimated that there are fewer than 10 PSAOs operating today.[5] PSAOs serve as yet another middleman in the system, further limiting independent pharmacies' ability to negotiate and bargain with the PBMs.

47.     Independent pharmacies, including Plaintiff, contract with the PBM Defendants, who each negotiate two key pricing terms: (1) the price that TPPs and their covered beneficiaries will pay pharmacies for each prescription, and (2) the amount that

---

[5] Avalere Health, *The Role of Pharmacy Services Administrative Organizations for Independent Retail and Small Chain Pharmacies* (Sept. 2021), https://www.hda.org/getmedia/9902c3e9-81ae-422c-b413-d982e995e9d4/The-Role-of-PSAOs-for-Independent-Retail-Small-Chain-Pharmacies.pdf.

the PBM will reimburse a pharmacy for the prescription medications dispensed. These reimbursement rates are based on negotiated rates that vary per drug.[6] In addition, the PBM Defendants charge the pharmacies fees, including DIR fees, per prescriptions dispensed. Direct and Indirect Remuneration fees – also called DIR fees – are on top of other administrative fees charged by the PBM Defendants and are  often charged retroactively—up to weeks or months after a prescription is dispensed.[7] Because of this, DIR fees are sometimes referred to as clawbacks. Between 2017 and 2023 alone, Defendant CVS Caremark clawed back approximately $22.6 million in DIR fees from pharmacies in OneroRx's network.

### 2.    PBM Pharmacy Networks

48.    Independent pharmacies, including Plaintiff, contract with the PBM Defendants for inclusion in the PBM Defendants' respective pharmacy networks. Pharmacy benefit managers, including the PBM Defendants, create retail pharmacy networks—i.e., the universe of pharmacies at which a PBM has authorized its covered beneficiaries to fill their prescriptions. A pharmacy benefit manager will generally aim to create a pharmacy network comprised of a mix of retail pharmacies (including

---

[6] Elizabeth Seeley and Surya Singh, *Competition, Consolidation, and Evolution in the Pharmacy Market: Implications for Efforts to Contain Drug Prices and Spending*, The Commonwealth Fund (Aug. 2021), https://www.commonwealthfund.org/publications/issue-briefs/2021/aug/competition-consolidation-evolution-pharmacy-market.

[7] Staff of H. Comm. on Oversight and Accountability, The Role of Pharmacy Benefit Managers in Prescription Drug Markets (July 2024), https://oversight.house.gov/wp-content/uploads/2024/07/PBM-Report-FINAL-with-Redactions.pdf.

independent pharmacies such as Plaintiff), specialty pharmacies, and mail order pharmacies. TPPs, in deciding which pharmacy benefit manager to hire, will consider a pharmacy benefit manager's pharmacy network and whether it would provide the TPP's members with ample convenient locations for them to fill their prescriptions. Thus, pharmacy benefit managers have an incentive to create a diverse and widespread retail pharmacy network.

49.     To meet health plan demands, some PBMs manage thousands of pharmacy networks annually, each with different compositions and features. Networks vary in design. Open networks include most pharmacies with uniform cost-sharing.[8] Limited networks restrict access to select pharmacies.[9] Medicare Part D plans often use preferred networks, where in-network pharmacies offer lower patient cost-sharing at preferred locations.[10]

50.     Pharmacies in limited or preferred networks accept lower reimbursements in exchange for higher prescription volume. Patients are steered to these pharmacies through cost-sharing incentives and network restrictions. PBMs may also design narrow networks that favor their vertically integrated pharmacies, even when independent pharmacies offer better pricing or terms.

---

[8] T. Joseph Mattingly II, et al., *Pharmacy Benefit Managers: History, Business Practices, Economics, and Policy*, 4 JAMA Health Forum 11 (2023).
[9] *Id.*
[10] 42 C.F.R. § 423.120(a)(9) (2025) ("[A] Part D plan that provides coverage other than defined standard coverage may reduce copayments or coinsurance for covered Part D drugs obtained through a preferred pharmacy . . . .").

51.     In a normal, competitive market, pharmacy benefit managers, including the PBM Defendants, compete against one another for pharmacies to be included in their network. They do this by negotiating price terms, such as reimbursement rates and dispensing fees. Larger PBMs, such as Defendants CVS Caremark and Express Scripts, can offer pharmacies lower reimbursement rates than smaller PBMs, such as Defendants MedImpact and Navitus. This is because larger PBMs are retained by more TPPs, and therefore process claims on behalf of more individuals, providing pharmacies with increased business. As horizontal competitors, it would not make sense for a smaller PBM, such as Navitus, to offer the same reimbursement rates as a larger PBM, such as CVS Caremark. In such a scenario, Navitus would struggle to find pharmacies willing to join its network. Thus, the contract terms between pharmacies and pharmacy benefit managers will necessarily differ—there is not a one-size-fits-all formula.

### 3.     Pricing Benchmarks

52.     Reimbursement rates are set out in the agreements between a pharmacy benefit manager and the contracted pharmacies in its network. Payers and PBMs use several benchmarks as reference points to determine how much they will reimburse pharmacies for prescription drugs. For instance, Actual Acquisition Cost ("AAC") represents the state Medicaid agency's estimate of the actual price pharmacies pay for drugs from manufacturers. It serves as the Medicaid benchmark for reimbursing drug ingredient costs.

53.    Average Manufacturer Price ("AMP") is the average price wholesalers and retail pharmacies pay manufacturers when purchasing drugs directly. Medicaid uses AMP to calculate drug rebates under the Medicaid Drug Rebate Program.

54.    Average Wholesale Price ("AWP") is the list price wholesalers set when selling drugs to retail pharmacies and nonretail providers. It functions as a starting point for payment negotiations, much like a sticker price.

55.    National Average Drug Acquisition Cost ("NADAC") estimates what pharmacies actually pay. NADAC calculates the national average of the prices at which pharmacies purchase a prescription drug from manufacturers or wholesalers, including some rebates. NADAC updates weekly and reflects real-world acquisition costs such as pharmacy invoice surveys.

56.    Wholesale Acquisition Cost ("WAC") is a manufacturer's list, or published catalogue, price for sales of a brand-name or generic drug to wholesalers. However, in practice, the WAC is not what wholesalers actually pay for drugs.

57.    Maximum Allowable Cost ("MAC") is generally the upper limit set by payors for generics, or, in this specific instance, the upper limit PBMs impose on the reimbursement amounts that pharmacies receive for generic drugs. The MAC is typically set at levels dramatically below the actual acquisition costs.

58.    Usual & Customary ("U&C") represents the pharmacy's cash price to the public.

20

59.    The Federal Upper Limit ("FUL") sets a reimbursement limit for some generic drugs; calculated as 175% AMP.

60.    Of particular significance here, when pharmacy benefit managers contract with a network of retail and community pharmacies to dispense prescription drugs to covered patients, the contract provides for a payment rate for each prescription, plus a dispensing fee. Pharmacies are also responsible for collecting patient cost-sharing payments. These contracts typically include a "lesser-of" rule, meaning the final payment defaults to whichever benchmark yields the lowest reimbursement. For example, a typical PBM-pharmacy network agreement might state that the reimbursement for a claim will be the lowest of: (a) AWP minus a negotiated percentage plus a dispensing fee; (b) the PBM's MAC price for that drug plus a dispensing fee; (c) the pharmacy's submitted ingredient cost claim plus the fee; (d) the pharmacy's U&C cash price; or (e) a flat submitted claim amount.

### a.    Federal Framework

61.    The Centers for Medicare & Medicaid Services ("CMS") introduced NADAC in 2013 in part to address inflated benchmarks like AWP. Federal regulations require states using NADAC to couple it with a dispensing fee that covers pharmacy service costs and ensures "efficiency, economy, and quality of care."[11]

---

[11] Under CMS's 2016 Covered Outpatient Drugs final rule (CMS–2345–F, codified at 42 C.F.R. Part 447), states using a NADAC-based model must also add a professional dispensing fee that covers the pharmacist's operational expenses, consistent with 42 U.S.C. § 1396a(a)(30)(A) (the "efficiency, economy, and quality of care" requirement).

21

62.     Many states now anchor Medicaid reimbursements to NADAC plus a professional dispensing fee. Some use "lesser-of" formulas that compare NADAC, WAC, MAC, or U&C, paying the lowest. For example, California uses the lesser of NADAC, WAC, Federal Upper Limit (FUL), or MAC, with a two-tier dispensing fee ($10.05/$13.20) tied to Medi-Cal pharmacy volume.

63.     For brand or generic drugs lacking NADAC data, states often default to WAC minus a percentage.

64.     States like West Virginia and Nebraska have codified NADAC-based methods and adjusted dispensing fees. West Virginia mandates NADAC + $10.49, defaulting to WAC if no NADAC exists. Colorado employs tiered fees (e.g., $9.31 vs. $14.14) to protect low-volume or rural pharmacies.

**b.     Private Framework**

65.     In private insurance, PBMs typically set their own MAC lists for generic drugs, paying little or no separate dispensing fee. Such agreements can produce below-cost reimbursements, particularly for independent stores that lack the leverage of larger chains. Unlike Medicaid, these contracts may rely on older benchmarks like AWP or undisclosed MAC formulas, leaving pharmacies uncertain whether they receive a true cost-based rate.

66.     NADAC plus a transparent dispensing fee has become the gold standard for Medicaid, but private PBMs largely stick to proprietary MAC lists or AWP-based rates.

This contrast leaves independent pharmacies in the crosshairs, since PBMs often pay them below cost while capturing profits through spread pricing or hidden markups.

67.     In practice, an AWP-minus formula or the MAC price are almost always the lowest benchmarks for generic drugs. Unsurprisingly, these tend to undercut other measures like U&C or the pharmacy's own charges. U&C prices, being higher than those discounted rates in nearly all cases, rarely determine the reimbursement—they only matter if a pharmacy's cash price is exceptionally low. Thus, if a pharmacy were to drop its cash prices or one benchmark falls, the reimbursement falls accordingly. Pharmacies cannot obtain a higher payment on an insured claim than the lowest among the contract benchmarks, even if their costs are higher.

68.     From the pharmacy's perspective, "lesser-of" clauses eliminate any cushion. Any time one reference price drops (due to aggressive MAC pricing, for example), it becomes the default. This prevents pharmacies from benefiting if, say, the AWP-based rate would have been a bit higher for a given drug; the MAC or other lower metric will overtake it. Such rules contribute to very thin margins for pharmacies, especially for generics where MAC prices set by PBMs are often extremely low. It also means that if a pharmacy accidentally sets a U&C for a drug, that low price could be forced upon all insured transactions for that drug as well, via the lesser-of clause. Overall, "lowest-of" reimbursement formulas ensure pharmacies consistently receive the smallest allowable reimbursement, increasing the risk that those reimbursements may not cover the pharmacy's true costs.

69.     In a competitive environment, pharmacies should expect reimbursements that align with actual acquisition cost (e.g., NADAC + a dispensing fee, or at least a fair MAC). The GoodRx ISP Scheme undermines traditional pricing benchmarks in several ways. First, it renders the usual contract formulas moot whenever the GoodRx-derived price is lower. A pharmacy benefit manager may normally reimburse based on NADAC or a MAC list, but under the GoodRx ISP Scheme, if another pharmacy benefit manager's MAC is lower, that becomes the reimbursement. The "lesser-of" rule is effectively extended beyond a single contract to between PBMs—the pharmacy is paid the lowest rate among all participating PBMs' rates, not just the lowest among the benchmarks in one PBM's contract. Second, it drastically lowers reimbursements across the board for generic drugs. What was once the lowest rate from a single pharmacy benefit manager now becomes the rate for all cooperating pharmacy benefit managers. This eliminates any higher payments that a pharmacy might have received from a PBM that had a slightly more generous rate. All the traditional benchmarks are supplanted if they would have allowed a higher payment.

70.     In sum, these established pricing benchmarks were meant to anchor pharmacy reimbursement in a manner that aligns with actual costs, but the GoodRx ISP Scheme extends the "lowest-of" principle across multiple PBMs, effectively ensuring that any single pharmacy benefit manager's rate dictates what all participating pharmacy benefit mangers pay. This erodes the benefit of potentially more generous terms and consistently drives reimbursements below pharmacies' true costs. Independent

pharmacies, in particular, find their margins further squeezed, where they cannot find a better deal or shift business to a pharmacy benefits manager that pays more, because the dominant players have agreed to pay the same minimal amount.

71.    In addition to providing a payment rate for each prescription, contracts between pharmacy benefit managers and independent pharmacies routinely contain an "effective rate" guarantee. Under this contract provision, pharmacy benefit managers guarantee pharmacies a minimum aggregate level of reimbursement. Typically, a pharmacy benefit manager will "true up" reimbursements between the pharmacy benefit manager and the pharmacy on a regular basis, and the pharmacy benefit manager will make additional payments to the pharmacies, where required, to meet the minimum reimbursement. The "effective rate" guarantee provisions, however, do not apply to prescription claims adjudicated through the GoodRx Integrated Savings Program. Thus, through the use of the GoodRx ISP, pharmacy benefit managers can avoid paying additional reimbursements to pharmacies that would otherwise be required under their contractually agreed upon "effective rate" guarantee clauses.

72.    Through the GoodRx Integrated Savings Program, the PBM Defendants not only artificially suppress the reimbursements paid to independent pharmacies, but also sidestep their existing contractual obligations to independent pharmacies.

**B.     The Market Dominance of Pharmacy Benefit Managers**

**1.     The Rise of PBMs in the Pharmaceutical Supply Chain**

73.     Originally established in the late 1960s, pharmacy benefit managers provide administrative services to health plans, including by processing claims and managing formularies. Over time, their responsibilities expanded to include negotiating prices with drug manufacturers. Given their independent status, pharmacy benefit managers were traditionally expected to pass savings back to health plans and consumers by leveraging their negotiation power to secure lower reimbursement rates with pharmacies and discounts with drug manufacturers.[12]

74.     In the 1990s, drug manufacturers began acquiring pharmacy benefit managers, which caused an "egregious conflict [] of interest," prompting the Federal Trade Commission ("FTC") to undo those deals. The deals allowed drug manufacturers to "coordinate pricing policies, see their competitors' sensitive pricing information, and favor their own drugs over those of their competitors."[13]

75.     In the early and late 2000s, pharmacy benefit managers started buying pharmacies, which has caused a similar conflict of interest that resulted from the merger of drug manufacturers and pharmacy benefit managers in the 1990s. When a pharmacy benefit manger combines with a pharmacy, they "lose the incentive to police against

---

[12] Brian S. Feldman, *Big pharmacies are dismantling the industry that keeps US drug costs even sort-of under control*, Quartz (Mar. 17, 2016), https://qz.com/636823/big-pharmacies-are-dismantling-the-industry-that-keeps-usdrug-costs-even-sort-of-under-control/.

[13] *Id.*

pharmaceutical company schemes to steer patients to more expensive drugs. Indeed, they

may collude in them."[14] The power of the largest pharmacy benefit managers has

continued to grow, allowing them to distort the pharmaceutical supply chain to their own

financial advantage.

### 2.    The Current Size and Role of PBMs in the Pharmaceutical Supply Chain

76.    According to the Pharmaceutical Care Management Association—the trade

group representing the PBM industry—pharmacy benefit managers now administer

pharmacy benefits for more than 275 million Americans.[15]

77.    Despite wielding immense control over medication access and costs, PBMs

operate with minimal transparency or public accountability. In 2022, recognizing these

concerns, the FTC issued special orders pursuant to Section 6(b) of the Federal Trade

Commission Act to the six largest PBMs—Caremark Rx, LLC; Express Scripts, Inc.;

OptumRx, Inc.; Humana Pharmacy Solutions, Inc.; Prime Therapeutics LLC; and

MedImpact Healthcare Systems, Inc.[16] These orders requested the production of

extensive data and documents on how the PBMs conduct business. In May and June

2023, the FTC issued supplemental orders to produce data and documents to three

additional PBM-affiliated entities. Despite issuing these orders over two years ago, some

---

[14] *Id.*

[15] *About PCMA*, Pharm. Care Mgmt. Ass'n., https://www.pcmanet.org/about (last visited May 16, 2025).

[16] *See* Press Release, Fed. Trade Comm'n, *FTC Launches Inquiry Into Prescription Drug Middlemen Industry* (June 6, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-launches-inquiry-prescription-drugmiddlemen-industry.

PBMs have yet to fully comply, prompting the FTC to demand that these companies complete their required productions promptly. These delay tactics, however, did not prevent the FTC from sharing preliminary findings supported by the documents and data obtained to date, as well as by publicly available information, in an Interim Report.

78.    In that Interim Report, the FTC detailed that the PBM market has grown highly concentrated and vertically integrated over the past two decades. Despite the fact that there are over 60 pharmacy benefit managers, only three PBMs—CVS Caremark, Express Scripts, and OptumRx—handle nearly 80% of the country's 6.6 billion annual prescriptions. When combined with Humana Pharmacy Solutions, MedImpact, and Prime Therapeutics, that share exceeds 90%. Many of these PBMs now own mail-order and specialty pharmacies, with one PBM controlling the nation's largest retail chain. In fact, the three biggest PBMs dominate almost 70% of specialty-drug revenues.

79.    The below figure demonstrates the market concentration within the pharmacy benefit manager industry.[17]

---

[17] Adam J. Fein, *The Top Pharmacy Benefit Managers of 2021: The Big Get Even Bigger,* Drug Channels (Apr. 5, 2022), https://www.drugchannels.net/2022/04/the-top-pharmacy-benefit-managers-of.html.



PBM Market Share, By Total Equivalent Prescription Claims Managed, 2021

| | |
|---|---|
| CVS Health (Caremark) | 33% |
| Cigna (Evernorth/Express Scripts)[1] | 26% |
| UnitedHealth (OptumRx) | 21% |
| Humana Pharmacy Solutions | 8% |
| MedImpact Healthcare Systems | 4% |
| Prime Therapeutics[2] | 4% |
| All Other PBMs + Cash Pay[3] | 4% |

80.     This market dominance gives PBMs vast control over drug costs and pharmacy revenues. They can collect rebates from drugmakers, decide which drugs are covered, and use practices such as spread pricing (where a pharmacy benefit manager reimburses a pharmacy less than what it bills the TPP, and pockets the difference) to boost their profits. PBMs also partner with wholesalers and the PBM Defendants' own affiliated pharmacies in procuring, distributing, and dispensing drugs. By acting as gatekeepers for prescription access and by being involved in every step of the pharmaceutical supply chain, pharmacy benefit managers wield immense influence over the flow of funds, predictably to their benefit.

81.     Although the pharmacy benefit manager market has recently been dominated by a few large players—Express Scripts, CVS Caremark, and OptumRx—this complaint specifically concerns Defendants CVS Caremark, Express Scripts, MedImpact, and Navitus. These PBMs, together with GoodRx, have engaged in the conduct described herein, and collectively serve plans covering over 175 million Americans and process

billions of claims annually, generating substantial revenues from their operations. Indeed, these PBMs process nearly two-thirds of all prescriptions in the country.

82.    Express Scripts is widely recognized as the largest PBM in the United States.[18] In 2022, its parent company, Cigna Corp., reported annual revenues of approximately $180.5 billion, and by December 31, 2022, Express Scripts' networks included more than 67,000 retail pharmacies.[19]

83.    CVS Health reported annual revenues of approximately $322.5 billion in 2022.[20] Its pharmacy services segment, which encompasses PBM activities, generated net revenues of $169.2 billion that year.[21]

84.    Its broader health services business, including CVS Caremark, saw revenue reach $90.8 billion in the first half of 2023—an 8.9% increase from the same period in 2022.[22]

85.    Through its subsidiary, CVS Health administers pharmacy benefits for a network of over 66,000 retail pharmacies—including roughly 40,000 chain pharmacies

---

[18] Anne Steele, *Express Scripts Revenue Falls*, WALL ST. J. (Feb. 14, 2017, 4:49 PM ET), https://www.wsj.com/articles/express-scripts-revenue-falls-1487108990.

[19] The Cigna Group, Annual Report (Form 10-K) (Feb. 23, 2023).

[20] CVS Health Corp., Annual Report (Form 10-K) (Feb. 8, 2023) at 73.

[21] *Id.*

[22] Denise Myshko, *CVS's Health Services Business Grows 9% in First Half of 2023*, MANAGED HEALTHCARE EXECUTIVE (Aug. 3, 2023), https://www.managedhealthcareexecutive.com/view/cvs-s-health-services-business-grows-9-first-half-of-2023.

and 26,000 independent pharmacies—and managed approximately 2.3 billion

prescriptions during the year ending December 31, 2022.[23]

86.    MedImpact is the sixth-largest pharmacy benefit manager in the United

States, processing over $40 billion in pharmacy transactions for over 20 million

individuals each year.[24] MedImpact's networks include over 60,000 pharmacies.

87.    Navitus is a smaller, but growing, pharmacy benefit manager, processing

pharmacy benefits for approximately 18 million individuals in 2025.[25]

88.    Together, Defendants CVS Caremark, Express Scripts, MedImpact, and

Navitus are responsible for processing over 60 percent of prescriptions in the United

States.

89.    Consequently, the considerable market share held by these defendants

significantly reduces the bargaining power of smaller pharmacy benefit managers when

negotiating with pharmacies.

### 3.    PBMs' Market Dominance and Vertical Integration

90.    The PBM Defendants have vertically integrated their operations by

combining PBM services with health insurer functions and with specialty, mail-order,

---

[23] CVS Health Corp., Annual Report, *supra* n.18 at 8-9.

[24] *Who we are*, MedImpact, https://www.medimpact.com/clients/who-we-are (last visited
May 16, 2025); *Research Update: MedImpact Holdings Inc. Assigned 'B+' Rating,
Stable Outlook; Senior Secured Debt Rated 'B+'*, S&P Global (Oct. 2, 2023, 3:54 PM
EDT), https://disclosure.spglobal.com/ratings/en/regulatory/article/-
/view/sourceId/12869733.

[25] Lauren Berryman, *Where smaller PBMs are headed this year*, Modern Healthcare (Jan.
6, 2025, 5:00 AM), https://www.modernhealthcare.com/insurance/navitus-health-
solutions-smithrx-capital-rx-pbm-market-2025.

and retail pharmacy operations, thereby exerting substantial influence over drug formularies, distribution channels, and reimbursement rates.

91.    For example, CVS Health is the parent corporation that owns the pharmacy benefit manager CVS Caremark, the retail pharmacy chain CVS Pharmacy, the specialty pharmacy chain CVS Specialty, and the mail order pharmacy chain CVS Caremark Mail Service Pharmacy. Similarly, the Cigna Group, the parent corporation of Express Scripts, owns the pharmacy benefit manager Express Scripts, the mail order pharmacy Express Scripts Pharmacy, and the specialty pharmacy Accredo.

92.    The PBM Defendants design narrow pharmacy networks and formulary systems that favor their own affiliated pharmacies, resulting in patients being directed exclusively to these entities—even when independent or local pharmacies offer comparable services. And studies have shown that the PBM Defendants pay higher reimbursement rates to their own affiliated pharmacies than to independent pharmacies, including those in OneroRx's network.[26] The favorable treatment for the PBM Defendants' own affiliated pharmacies similarly extends to specialty pharmacies where the PBM Defendants steer patients to their own affiliated specialty pharmacies by preventing independent pharmacies from filling specialty medications.

---

[26] *See, e.g.*, In the Matter of Express Scripts Administrators, LLC, TID No.: 25-14, Order Adopting Report on Audit, Tennessee Department of Commerce and Insurance (Apr. 10, 2025) ("[Express Scripts] reimbursed non-affiliate pharmacies in the state of Tennessee less than the amount the company reimbursed its affiliate pharmacies for the same drug or dispensed product or service.").

93.    The FTC's analysis of two generic medications—abiraterone acetate (generic Zytiga) and imatinib mesylate (generic Gleevec)—shows that pharmacies affiliated with the three largest pharmacy benefit managers frequently receive reimbursements at levels 20- to 40-times higher than the National Average Drug Acquisition Cost ("NADAC"). The following figure illustrates how these reimbursements differ between commercial and Medicare Part D payers from 2020 to 2022, using weighted averages for each of the Big 3 PBMs.[27]



Figure 11. Gross Pharmacy Reimbursement Rates
For a One-Month Supply of Two Specialty Generics
Paid to PBM-Affiliated and Unaffiliated Pharmacies
By Commercial and Medicare Part D Plans and Members
Managed By the Big 3 PBMs, and NADAC, 2020-2022[200]

A. Abiraterone Acetate (generic Zytiga for prostate cancer)



B. Imatinib Mesylate (generic Gleevec for leukemia)

---

[27] *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, Interim Staff Report, U.S. Federal Trade Commission, Office of Policy Planning (July 2024) at 41, https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf.

94.     Commercial health plans managed by these PBMs reimbursed affiliated pharmacies for abiraterone acetate at an average of more than $5,800 per monthly supply in 2022—approximately 25 times the NADAC-based acquisition cost of $229.

95.     Medicare Part D plans similarly paid affiliated pharmacies 23 times NADAC for the same drug.

96.     In the case of imatinib mesylate, commercial plans averaged around $2,700 per month in 2022, exceeding 40 times the $66 NADAC rate, while Medicare Part D reimbursements hovered near 36 times NADAC. Although the magnitude of these reimbursements varied by PBM, drug, payer group, and year, simply comparing these rates to NADAC likely understates the actual spread, as PBM-affiliated pharmacies typically acquire medications below NADAC.

97.     One PBM's internal data showed that it billed payors at nearly 250 times its true acquisition cost for imatinib mesylate in 2021. This pricing approach ultimately prompted client questions, particularly about specialty generic drug pricing. In response, an executive from another PBM's parent corporation noted that CMS expects lower prices at preferred pharmacies, further complicating the situation when plan designs steer patients to mail-order services that cost significantly more.

[Y]ou can get the drug [imatinib mesylate] at a non-preferred pharmacy (Costco) for $97, at Walgreens (preferred) for $9000, and at preferred home delivery for $19,200. CMS expects that plans that offer preferred pharmacy constructs have lower pricing in the preferred channel. Compounding the

34

challenge/optics is the fact that we've created plan designs to aggressively steer customers to home delivery where the drug cost is ~200 times higher. The optics are not good and must be addressed.[28]

### 4. Background on Pharmacy Benefit Manager Misconduct

98.     Before teaming up with GoodRx, pharmacy benefit managers were already under intense scrutiny for their broader misconduct. Critics have long charged that vertically integrated pharmacy benefit mangers not only contributed to escalating brand drug prices but also leveraged their dominant market positions to under-reimburse independent pharmacies and direct patients toward affiliated networks. Such practices, including spread pricing and the use of retroactive clawbacks, have systematically eroded the viability of independent pharmacies. These additional examples of pharmacy benefit manager misconduct provide context for understanding the environment in which the ISP Scheme emerged.

#### a.     Spread Pricing

99.     Pharmacy benefit managers profit at the detriment of independent pharmacies through a practice called "spread pricing."

100.    As documented in the FTC report, many pharmacy benefit managers employ spread pricing where pharmacy benefit managers reimburse pharmacies at one rate and simultaneously bill payors at a higher rate, creating a hidden price gap that is not

---

[28] *Id.* at 42.

transparent to the affected parties. The following figure is an illustration of spread pricing:[29]



101.    An independent analysis—the Washington State Prescription Drug Pricing Analysis—examined over nine million prescription claims and found that, in a subset of matched claims, the average plan sponsor incurred approximately $165,000 higher costs than the corresponding pharmacy reimbursements, translating to an approximate differential of $8 more per prescription.[30] In one case, while retail pharmacies lost $18.77 below the acquisition cost for generic Suboxone (buprenorphine-naloxone SL), plan sponsors were billed $100.12 above the underlying cost.[31]

---

[29] The Role of Pharmacy Benefit Managers in Prescription Drug Markets, *supra* n.5.
[30] Washington Health Alliance and Washington State Pharmacy Association, PRESCRIPTION DRUG PRICING IN WASHINGTON: EMPLOYERS OVERCHARGED, PHARMACIES UNDERPAID, PBMs REAPING PROFITS, https://cdn.ymaws.com/www.wsparx.org/resource/resmgr/pbm/wspa-wha_prescription_drug_p.pdf (last visited May 16, 2025).
[31] *Id.*



102.    Retail pharmacies encounter more frequent below-cost reimbursements than plan sponsors experience below-cost charges. Specifically, approximately 11% of plan sponsor claims fall below the underlying drug cost. On the other hand, 18% of pharmacy claims do so. These differences add up as the percentile analysis progresses, resulting in plan sponsors being charged $172 above drug cost at the 99th percentile, while pharmacies' reimbursements top out at about $120 above cost at that same percentile.

103.    Between 2020 and 2023, the Washington state analysis determined that plan sponsor costs increased by thirty percent, evidencing a widening disparity between the prices charged to employers and the amounts paid to pharmacies.

104.    Moreover, the same Washington state analysis revealed that PBM-affiliated mail-order pharmacies-imposed prescription markups that were more than three times higher than those observed at retail pharmacies; for certain costly specialty drugs, plan sponsors were charged over $1,000 in markups per prescription, despite retail pharmacies often filling these drugs at a loss.

105.    Additional findings highlight how brand-name medications can drive significant overall spending for plan sponsors, while generic drug pricing poses a critical threat to the financial stability of small pharmacies. Brand drugs constituted 71 percent of total retail pharmacy sales but only 4 percent of the estimated margin; conversely, generics accounted for 29 percent of sales yet 96 percent of the margin. Even minimal reductions in generic reimbursement can be devastating for independent pharmacies, yet may appear less consequential to plan sponsors.

106.    As a result of these practices, Defendants' actions have led to significant economic harm: plan sponsors face substantially inflated drug costs, while independent and retail pharmacies receive reimbursements insufficient to cover their acquisition and operational costs.

107.    The report further explores "class of trade" differences, recognizing that certain pharmacies or dispensing channels (e.g., mail-order) may yield disproportionately higher markups. For generic medications, the study found that PBM-affiliated mail-order pharmacies can generate margins more than four times higher than grocery store pharmacies. For brand name drugs, mail-order channels showed markups more than 35 times greater than those of small-chain or independent pharmacies. One notable example involves the multiple sclerosis medication teriflunomide (generic Aubagio), available at PBM-affiliated mail-order pharmacies for around $4,465 per prescription while costing under $20 at select cost-plus mail pharmacy services.

108.    There is still more evidence. Take the 2022 Three Axis Advisors study in Oregon, that states that local pharmacies were already being reimbursed below their acquisition and labor costs for 75 percent of claims.

109.    The cumulative effect of Defendants' consolidation, vertical integration, prescription steering, and spread pricing has distorted the competitive landscape of the U.S. prescription drug market, resulting in higher drug costs for employers and undermining the financial viability of independent pharmacies.

110.    In recent years, the practice of spread pricing has come under sharp criticism. In response, some states have enacted laws limiting pharmacy benefit managers' ability to use spread pricing and many health plans have begun requiring that pharmacy benefit managers "pass through" discounts to their TPP clients.

111.    Under the guise of the ISP Scheme, however, pharmacy benefit managers are able to continue to benefit from spread pricing without violating their pass-through obligations to their clients. Under the ISP Scheme, GoodRx charges and collects the processing fees, rather than the pharmacy benefit manager responsible for processing the claim. GoodRx then shares this fee with the pharmacy benefit manager. But, because the shared fee comes from GoodRx, which has no contractual relationship to the TPP, the fee is not subject to the pass-through requirements negotiated between the TPP and its pharmacy benefit manager.

### b. Clawbacks

112.    Another way pharmacy benefit managers profit at the expense of
independent pharmacies is through the imposition of fees, including DIR fees, collected
after a pharmacy benefit manager processes prescription fees. These fees, often called
"clawbacks" or "post-purchase discount provisions," are frequently built into the
contracts between non-PBM affiliated pharmacies and pharmacy benefit managers.
Under these contractual agreements, pharmacies must pay the pharmacy benefit
managers various fees, sometimes long after sales take place.[32]

113.    Independent pharmacies rely on being included in pharmacy benefit
managers' networks for survival. If they refuse the pharmacy benefit managers' terms,
they risk losing insured customers. Many states have passed laws banning clawback fees,
but the imbalance remains. Market power continues to consolidate, and smaller
pharmacies struggle to compete.

### c. Policy and Legal Scrutiny of PBM Practices

114.    Government investigations have begun scrutinizing PBM practices. Federal
and state authorities, including the Federal Trade Commission, have raised concerns
about unfair competition and spread pricing. All fifty states have enacted PBM-related
legislation. The Supreme Court's 2020 *Rutledge* decision empowered states to oversee

---

[32] Arthur Allen, *What to know about the drug price fight in those TV ads*, NPR (July 7,
2023, 5:06 AM ET), https://www.npr.org/sections/health-
shots/2023/07/07/1186317498/pharmacy-benefit-manager-pbm-ads-congress.

PBM reimbursements. The Pharmacy Benefit Manager Transparency Act of 2023 proposes tighter federal limits on PBM abuses and mandatory pass-through of discounts.

115.    The Federal Trade Commission also launched a major PBM probe and criticized vertical integration in a 2024 Interim Report. The Report highlighted "gatekeeper tactics" that favor affiliated pharmacies. Observers expect further policy intervention, given the scale of alleged harm to independent pharmacies.

### 5.    PBMs' Disproportionate Bargaining Power and Its Effects on Independent Pharmacies

116.    The GoodRx ISP Scheme is yet another example of pharmacy benefit managers abusing their size and power for profit. As described above, pharmacy benefit managers establish and oversee pharmacy networks to deliver prescription benefits to the clients' members. To join a PBM's pharmacy network—or to gain "preferred" status to attract more patients—pharmacies attempt to negotiate contract terms, including reimbursement rates for medications.

117.    Even without the unlawful conduct alleged here, pharmacies enter these "negotiations" at a disadvantage. Because the six biggest PBMs control over 90 percent of total dispensing volume, with the largest three covering approximately 270 million people, pharmacies almost always are forced to accept less favorable terms in their network contracts with large PBMs. This dynamic confers substantial leverage on the biggest PBMs, enabling them to impose contract terms that may disadvantage smaller, independent pharmacies.

118.   PBMs use their consolidated market position to exert leverage over
pharmacies seeking network inclusion. Stakeholders, including independent pharmacies
and large PSAOs, report being forced into unfavorable contracts with these dominant
PBMs.

119.   If a pharmacy refuses to accept the PBM's terms, it risks losing access to the
high-volume patient base affiliated with that PBM's health plan.

120.   In certain cases—especially in rural areas or networks with limited
alternatives—PBMs may enforce or offer unfavorable contract and pricing terms. While
PBMs negotiate contracts with large, unaffiliated chain pharmacies (e.g., supermarkets
and "big box" retailers) through formal proposals and bidding processes, smaller
independent pharmacies often face a different reality.

121.   Internal PBM documents indicate that once an independent pharmacy joins a
PBM network, changes to that pharmacy's contract—such as modified reimbursement
rates based on changes to MAC prices, shifts in network participation, or new
classifications (e.g., retail vs. other formats)—are frequently imposed unilaterally. These
arrangements are sometimes called "unilateral contracts" or "passive contracts." Under
this approach, a PBM merely provides notice to the pharmacy of new terms, which go
into effect automatically unless the pharmacy affirmatively opts out. Pharmacies are often
forced to make decisions on whether to accept these new terms under strict or
cumbersome timelines. A study found that passive contracts can constitute a large share
of all PBM contracts, especially those extended to independent pharmacies and smaller

chains, and are commonly sent via "fax blasts," which effectively bind the pharmacy to new terms by default. Smaller pharmacies, in particular, often lack the staffing or legal resources to evaluate—and possibly reject—such changes.

122.   This unilateral notification is the same way that independent pharmacies, including those in OneroRx's network, learned of the relationship and agreements between GoodRx and the PBM Defendants. Independent pharmacies were not provided an opportunity to negotiate their relationship with GoodRx – it was decided for them and imposed upon them by the PBM Defendants.

123.   Independent pharmacies, including Plaintiff, rely on receiving higher negotiated reimbursement rates to counteract the unfavorable reimbursement rates they receive on other drugs. The GoodRx ISP Scheme, by universally imposing the lowest-negotiated rate per prescription drug, further harms an already threatened industry.

124.   The actions by these pharmacy benefit managers can leave independent pharmacies with no practical choice but to accept unfavorable reimbursement contracts or close. The impact of such closings on communities is severe.

125.   Thousands of independent pharmacies have closed, creating health care gaps in rural and underserved areas.

126.   In 2014, researcher Dima M. Qato and colleagues coined the term "pharmacy deserts" to describe geographic areas where residents lack adequate and convenient access to prescription medications and pharmacy services—such as rural

towns that are left without any local pharmacy. The researchers drew parallels to the

concept of "food deserts" as defined by the U.S. Department of Agriculture.

127.   When the only pharmacy in town disappears, residents—especially those

who are older or have limited mobility—face travel burdens and delayed access to

medications. Local businesses also feel the ripple effects as residents go elsewhere to

shop.



**Newly Created Deserts**
Nearly 800 ZIP codes that had at least one pharmacy in 2015 now have none.

Notes: The data reflect closings of both chain and independent pharmacies. The map compares deserts on July 31, 2015, with deserts on Sept. 30, 2024. The Census Bureau tracks more than 33,000 ZIP codes.  ·  Source: Luke Slindee analysis of pharmacy data  ·  By Karl Russell

128.    According to *The New York Times*, nearly 800 ZIP codes that had at least one pharmacy in 2015 now lack a single operating pharmacy.[33] Research conducted by GoodRx itself underscores the accelerating severity of this issue: in 2021, over 41 million Americans resided in pharmacy deserts, defined as locations where individuals must drive more than 15 minutes—consistent with the U.S. Department of Agriculture's food desert standard—to reach the nearest pharmacy. By 2023, GoodRx reported that number had risen to more than 45 million, an alarming increase of over 9 percent within just two years, a rate surpassing overall population growth.[34] Today, more than 46 percent of U.S. counties have become pharmacy deserts. Far from mitigating this trend, GoodRx's partnership with major PBMs actively contributes to the proliferation of pharmacy deserts, leaving millions of Americans without convenient or equitable access to essential healthcare.

129.    Studies have shown that after a local pharmacy closes, patients are more likely to miss doses and forego timely medical treatment.[35]

130.    These closures also remove a key source of localized care and support. Independent pharmacists often serve as a primary point of contact for patients with

---

[33] Reed Abelson and Rebecca Robbins, *The Powerful Companies Driving Local Drugstores Out of Business*, N.Y. Times (Oct. 19, 2024), https://www.nytimes.com/2024/10/19/business/drugstores-closing-pbm-pharmacy.html.

[34] Amanda Nguyen, *Over 45 Million Americans Lack Convenient Access to a Pharmacy*, GoodRx (July 31, 2024), https://www.goodrx.com/healthcare-access/research/many-americans-lack-convenient-access-to-pharmacies.

[35] *See* Dima M. Qato, et al., *Association Between Pharmacy Closures and Adherence to Cardiovascular Medications Among Older US Adults*, 5 JAMA Network Open 2 (Apr. 2019).

limited access to doctors, providing medication counseling, immunizations, and referrals to other healthcare providers.[36]

131.    Notably, the importance of independent pharmacies is not limited to rural and underserved communities with otherwise limited access to healthcare services. Independent pharmacies are embedded within their communities, allowing them to build relationships with their patients. Because of this, patients may feel more comfortable discussing their health concerns with pharmacists, and as a result, pharmacists can offer customized services and provide more personalized care. The close relationships cultivated between patients and pharmacists at independent pharmacies also helps ensure that patients are taking their medicine as prescribed, and not skipping doses. Independent pharmacies directly contribute to the well-being of their patients and communities.

## C.    Traditional Prescription Discount Cards and Pharmacy Savings Clubs

### 1.    Voluntary Discounts for Uninsured Patients

132.    Historically, pharmacies participated in savings programs on a voluntary basis to help uninsured or cash-paying customers.

133.    In the 1990s, many large chains offered pharmacy savings clubs—subscription-based programs that gave uninsured patients discounts off the pharmacy's U&C price. These early discount cards or clubs were designed to attract new customers who might otherwise forgo their medications due to cost.

---

[36] *See* Reed Abelson and Rebecca Robbins, *supra* n.30.

134.   Pharmacies were willing to accept lower margins on these transactions as a trade-off for increased foot traffic and goodwill, given that the volume of such cash-paying customers was relatively small.

135.   In essence, pharmacies opted in to these programs hoping to gain business they would not otherwise have, making the discounts a win-win: uninsured patients paid less, and pharmacies gained new customers.

### 2.    GoodRx's Original Model

136.   GoodRx launched in 2011 with a similar promise of helping uninsured patients. It positioned itself as a free discount card program for the uninsured, allowing anyone to access PBM-negotiated lower prices instead of paying exorbitant cash rates.

137.   GoodRx's platform compared prices across multiple PBMs' discount networks and provided consumers with a coupon for the lowest price available at their pharmacy.

138.   Initially, this was intended to benefit uninsured or under-insured individuals, and it was marketed as a way for pharmacies to bring in new business from cost-sensitive patients. However, over time, insured patients began using GoodRx in large numbers, a shift driven by rising out-of-pocket costs for those with insurance. High deductibles and co-pays meant that even people with insurance could sometimes get a better deal by paying cash with a GoodRx coupon.

139.   By paying the GoodRx price (the discounted cash price) instead of their insurance co-pay, these insured customers often saved money. This trend fundamentally

changed GoodRx's impact on pharmacies: rather than delivering mostly new, uninsured customers, GoodRx was now funneling existing insured patients into a cash-pay system.

140.   From the pharmacy's perspective, each GoodRx transaction by an insured patient represented a sale they likely would have made anyway, but now at a lower price and with hefty fees taken out. In fact, by 2016, over 80 percent of GoodRx's prescription transactions were repeat purchases by existing GoodRx users (as opposed to one-time prescription fills by new customers).

141.   The original value proposition for pharmacies evaporated because they were losing money on prescriptions that their insured customers would have bought from them regardless, had they used their insurance.

**3.    Pharmacy Push Back**

142.   As GoodRx's user base tilted toward insured consumers, pharmacies became increasingly reluctant to honor GoodRx coupons. Many pharmacies started opting out of GoodRx's discount network when they realized the volume of low-margin transactions was concerningly high. This hit a climax in 2022, when Kroger—the nation's sixth-largest pharmacy chain—announced it would no longer accept GoodRx for certain prescriptions.

143.   Kroger's decision was a massive blow to GoodRx. Kroger accounted for roughly a quarter of GoodRx's prescription volume at the time, translating to an estimated $150 million annual revenue loss for GoodRx. GoodRx's stock price plummeted over 25 percent overnight following the news. Other pharmacies took note,

48

with some chains and independents beginning to void discount-card prescriptions or offer their own price-matching to avoid paying fees to intermediaries. In short, the traditional voluntary discount card model was collapsing for GoodRx. Pharmacies were no longer willing to subsidize GoodRx's growth when the discounts were being used by insured customers and eroding pharmacy margins.

### 4. Setting Stage for the ISP Pivot

144.    The backlash from pharmacies threatened GoodRx's core business model. GoodRx executives recognized that a discount program dependent on voluntary pharmacy participation was not sustainable long-term if pharmacies could simply refuse to accept the coupons.

145.    By late 2021, shortly after GoodRx became a public company, the company quietly began plotting a new strategy to preserve its business. In July 2021, GoodRx acquired a technology platform called RxNXT LLC, which enabled real-time exchange of claims data and pricing information with PBMs.

146.    Using this technology, GoodRx started developing what it would call the ISP—a new model in which GoodRx would embed itself into the pharmacy claims process of major PBMs. This integration would remove the need for patients to present an external GoodRx card and, more importantly, remove the ability of pharmacies to opt out.

147.    Importantly, as described earlier, pharmacies once had the choice to participate with GoodRx voluntarily. This allowed pharmacists to weigh the benefits of

increased patient access against the potential reduction in reimbursement. By choosing whether to accept these cards, pharmacies could protect their profit margins and tailor their services to the needs of their communities.

148.   Instead of persuading pharmacies to accept coupons, GoodRx would soon find a way to make itself an unavoidable part of the insurance claims system, ensuring its low-price algorithm kicked in on as many transactions as possible.

149.   In early 2024, GoodRx and several large PBMs rolled out the ISP scheme.

**D.    The GoodRx ISP Scheme**

150.   At the beginning of 2024, GoodRx and the PBM Defendants launched the ISP Scheme. This scheme directly embedded GoodRx's pricing technology into the PBMs' own claims-processing systems, effectively making GoodRx a built-in feature of the prescription adjudication process.

151.   Instead of acting as a standalone discount card that a patient might choose to use, GoodRx's algorithm now operates behind the scenes on every eligible prescription claim for generic drugs processed by participating PBMs.

152.   In essence, GoodRx went from being an optional, external coupon provider to becoming an integral part of the PBM infrastructure. The ISP allows the PBMs to automatically apply GoodRx's discount pricing for any given prescription if it results in a lower price than the standard insurance rate. This means patients on those PBM plans get the benefit of a lower out-of-pocket price (often counting toward their deductible), but the

pricing decision is no longer solely determined by the patient's own PBM's contract with the pharmacy—it's determined by GoodRx's cross-PBM comparison engine.

153. An independent pharmacy cannot refuse to accept the lower reimbursement rate or opt out of the system without leaving the PBM's network entirely—an impossible decision given the market dominance of the PBM Defendants.

154. By integrating at the "switch" level (the level of the claims adjudication platform that routes transactions between pharmacies and PBMs), GoodRx gains access to real-time, competitively sensitive pricing information from all participating PBMs on each transaction.

### 1. ISP Steps

155. A health insurance plan hires a pharmacy benefit manager to manage prescription drug benefits for the plan's covered beneficiaries. When one of these covered beneficiaries goes to their pharmacy to fill a generic prescription, they present their insurance card at the counter. Under the ISP Scheme, when individuals whose prescription drug benefits are managed by one of the PBM Defendants go to fill their prescriptions, the pharmacy submits the claim through the normal PBM claims process. GoodRx's software is embedded in that process, via the PBM's claims switch or claims platform. The integration was enabled by GoodRx's RxNXT technology, which facilitates rapid data exchange with PBM systems.

156.    GoodRx's system then identifies the lowest price available among all the PBMs in GoodRx's broader network for that particular prescription—the rock-bottom rate that at least one PBM has negotiated with the pharmacy.

157.    The claim is then adjudicated at that lowest price. In practice, this can mean one of two things: either the patient's own PBM matches that lower rate, or the claim is switched and processed through whichever PBM had the lowest price (with the patient's PBM's consent via the ISP agreement). Either way, the pharmacy is reimbursed at the lowest rate identified, not the higher rate it might have been entitled to under the patient's normal insurance plan terms. This happens automatically and without informing the patient or pharmacy.

158.    Importantly, because the ISP is integrated with their insurance, that payment counts toward their deductible as if it were an insurance claim. This was a selling point of the ISP—unlike using an outside coupon, patients don't sacrifice their insurance benefits.

159.    For each such ISP transaction, the pharmacy is charged a "processing fee" of about $7 to $10. GoodRx and the PBMs involved split this fee between themselves. Notably, if the claim was rerouted to a different PBM's platform to take advantage of a lower rate, both the patient's own PBM and the PBM with the lowest price share in the fee. This fee comes out of the pharmacy's pocket.

160.    The end result is that the pharmacy receives the lowest reimbursement possible on that prescription—the worst deal that any one PBM had negotiated now becomes the standard rate for all. The PBM Defendants, meanwhile, increase their profit

52

(or reduce their costs) on the transaction: they either pay the pharmacy less (if it was their own claim originally) or they get a cut of the fee for handing off the claim to the lowest-priced PBM.

161.    GoodRx takes a share of each fee as well, reviving its revenue stream.

162.    In short, the ISP Scheme uses GoodRx's technology to artificially suppress pharmacy drug reimbursements to the lowest common denominator.

### 2.    GoodRx's Public Announcement of the ISP Scheme and Partnerships

163.    On information and belief, GoodRx announced the creation of the ISP in partnership with the PBM Defendants. In its 2022 Annual Report, GoodRx described launching "an exclusive new collaboration" with Express Scripts to integrate GoodRx's discount pricing into the PBM's prescription benefit.[37] GoodRx explained that through this program (branded "Price Assure, powered by GoodRx"), Express Scripts would incorporate GoodRx's prescription pricing for generic drugs. Under this arrangement, GoodRx's pricing was integrated into Express Script's commercial pharmacy benefit for generic medications, so that beneficiaries "automatically get the lowest out-of-pocket cost by comparing the GoodRx price with the price from their Express Scripts PBM plan," with all spending applied to deductibles.[38]

---

[37] Adam J. Fein, *Behind the GoodRx-Express Scripts Partnership: How PBMs Profit from Discount Cards in Pharmacy Benefits*, Drug Channels (Nov. 15, 2022), https://www.drugchannels.net/2022/11/behind-goodrx-express-scripts.html.
[38] *Id.*

164.    GoodRx's co-CEO explained that an eligible Express Scripts member would have "seamless access to GoodRx prices…where that price is lower than their benefit price" as part of their normal insurance benefit.[39]

165.    Express Scripts confirmed its participation. In a July 2022 Evernorth press release, Express Scripts announced that it "expanded our collaboration with GoodRx to integrate their pricing into the pharmacy benefit for generic medications," enabling customers to "automatically access lower prices, if available, on their medications and apply it to their deductible."[40]

166.    An Express Scripts spokesperson further lauded the partnership amid later scrutiny, stating: "Our partnership with GoodRx helps promote lower prices for patients at the pharmacy counter by directly integrating discount card pricing with customers' pharmacy benefits."[41]

167.    In July 2023, CVS Caremark and GoodRx announced a new program called "Caremark Cost Saver." This program would "bring GoodRx discount pricing to commercially insured [CVS Caremark] plan members" for generic prescriptions filled at in-network pharmacies.[42]

---

[39] *Id.*

[40] *How partnership drives improved affordability and safety at the pharmacy*, Evernorth Health Services (July 13, 2022), https://www.evernorth.com/articles/increased-pharmacy-savings-and-affordable-prescription-medication.

[41] *GoodRx and CVS Sued for Suppressing Pharmacy Reimbursement*, PYMNTS (Nov. 5, 2024), https://www.pymnts.com/legal/2024/goodrx-and-cvs-sued-for-suppressing-pharmacy-reimbursement.

[42] Zacks Equity Research, *CVS Health (CVS) Launches Caremark Cost Saver With a New Pact*, NASDAQ.com (July 13, 2023, 11:42 AM EDT),

168.    GoodRx's co-founder noted that this CVS Caremark alliance was the second major ISP partnership (after Express Scripts) and a sign of the program's success, with "the two largest [PBM] players" embracing the model.[43]

169.    On September 13, 2023, GoodRx and MedImpact "announced a new savings solution designed to integrate GoodRx's prescription pricing … at the pharmacy counter."[44] The partnership followed the same model as GoodRx's previous arrangements: when eligible members fill prescriptions for generic medications, the program "will automatically compare their benefit and the GoodRx price and then deliver the lowest one."[45]

170.    By September 2023, GoodRx affirmed it was "partnering with pharmacy benefit managers and their plan sponsors to collaboratively integrate into the insurance benefit market." According to GoodRx, its "[ISP] programs with CVS Caremark, Express

---

https://www.nasdaq.com/articles/cvs-health-cvs-launches-caremark-cost-saver-with-a-new-pact.

[43] Marissa Plescia, *CVS Caremark, GoodRx Launch Program To Lower Drug Costs*, MedCity News (July 12, 2023), https://medcitynews.com/2023/07/cvs-prescription-drug-costs/.

[44] Bill Schiffner, *GoodRx and MedImpact announce new program for access to affordable prescriptions*, Chain Drug Review (Sept. 13, 2023, 9:26 AM), https://chaindrugreview.com/goodrx-and-medimpact-announce-new-program-for-access-to-affordable-prescriptions/.

[45] *GoodRx and MedImpact Announce Program to Ensure Seamless Access to Affordable Prescriptions*, GoodRx (Sept. 13, 2023), https://investors.goodrx.com/news-releases/news-release-details/goodrx-and-medimpact-announce-program-ensure-seamless-access.

Scripts, and MedImpact, GoodRx savings are seamlessly integrated at point-of-sale with three major PBMs that reach over 60% of insured lives."[46]

171.  On October 12, 2023, GoodRx and Navitus jointly unveiled the "Savings Connect" program.[47] Prices are compared "behind the scenes" and "[n]o additional action is required by eligible Navitus members to access GoodRx savings through the Savings Connect program."[48] A GoodRx program officer stated, "We are excited to partner with Navitus to deliver lower-cost prescriptions to their members, and also strengthen the impact of our prescription savings within the insurance benefit marketplace."[49]

172.  Each of the above pharmacy benefit managers not only agreed in principle, but launched programs implementing the GoodRx ISP Scheme. These programs – Express Scripts' Price Assure, CVS Caremark's Caremark Cost Saver, MedImpact's integrated savings program, and Navitus' Savings Connect – are different in name only. At bottom, each program represents an agreement between the PBM Defendants and GoodRx to enter into the ISP Scheme. By January 2024, all four participating PBMs— Express Scripts, CVS Caremark, MedImpact, and Navitus—had rolled out their

---

[46] *GoodRx and MedImpact Announce Program to Ensure Seamless Access to Affordable Prescriptions*, MarketScreener (Sept. 13, 2023, 9:00 AM EDT), https://www.marketscreener.com/quote/stock/GOODRX-HOLDINGS-INC-112833794/news/Goodrx-and-Medimpact-Announce-Program-to-Ensure-Seamless-Access-to-Affordable-Prescriptions-44835037.

[47] *GoodRx, Navitus Health Solutions launch Connect Program*, Navitus (Oct. 12, 2023), https://navitus.com/news/goodrx-navitus-health-solutions-launch-connect-program.

[48] Sandra Levy, *GoodRx, Navitus Health Solutions launch Connect Program*, Drugstore News (Oct. 11, 2023), https://drugstorenews.com/goodrx-navitus-health-solutions-launch-connect-program.

[49] *Id.*

integrated GoodRx pricing programs for plan members. These public statements confirm that GoodRx invited multiple PBMs to join its ISP and integrate GoodRx's discount platform into their claims processing systems.

**E.    Direct and Indirect Evidence of an Unlawful Horizontal Conspiracy**

    **1.    Direct Evidence of a Horizontal Price-Fixing Agreement**

173.    The PBM Defendants' contractual agreements with GoodRx constitute direct evidence of an unlawful horizontal price-fixing agreement. The PBM Defendants each knowingly and willingly entered into an agreement with GoodRx to participate in the ISP Scheme. On information and belief, pursuant to these contracts, the PBM Defendants agree to reimburse pharmacies for generic prescription medications at the lowest-negotiated rate by *any* PBM in GoodRx's network.

174.    Defendants' own admissions, made in their public statements describing the ISP Scheme, also serve as direct evidence of the horizontal price-fixing agreement. In the 2025 GoodRx Investor Presentation, GoodRx describes the Integrated Savings Program, explaining that a "behind-the-scenes pricing tool" will compare the "insurance price" with the "lowest available price from [the GoodRx] network of PBMs" and offer consumers the lower of the two.[50] Similarly, in September 2023, GoodRx released a press release announcing its partnership with MedImpact under the ISP Scheme. In this press release, GoodRx described the ISP Scheme, emphasizing that it would "integrate GoodRx's prescription pricing in a seamless experience at the pharmacy counter" by

---

[50] *See* Investor Presentation, *supra* n.1.

automatically comparing a MedImpact member's price with the GoodRx price and

offering the lowest of the two.[51] Each PBM Defendant released a press release describing

the nature of the ISP Scheme and admitting to the existence of the Scheme and their

participation in it.

### 2.    Indirect Evidence of a Horizontal Price-Fixing Agreement

175.    There is also circumstantial evidence of Defendants' unlawful horizontal

price-fixing agreement.

176.    Pursuant to the ISP Scheme, the PBM Defendants each entered into an

agreement with GoodRx that they would not have entered into under normal competitive

market conditions.

177.    Under normal market conditions, the PBM Defendants compete with one

another for a pharmacy's inclusion in their respective pharmacy networks. This is

because, as alleged in detail above, a pharmacy benefit manager must create an expansive

pharmacy network to be attractive to prospective clients—health plans and other third-

party payors. In order to create this network, the PBM Defendants negotiate

reimbursement rates with pharmacies.

178.    The reimbursement rates paid by the PBM Defendants under the GoodRx

ISP Scheme—the lowest negotiated-rate from any pharmacy benefit manager in

GoodRx's network—would not be feasible absent the Scheme. As an initial matter,

---

[51] *See* GoodRx and MedImpact Announce Program to Ensure Seamless Access to
Affordable Prescription, *supra* n.42.

absent the Scheme, the PBM Defendants would not have access to the reimbursement rates of other pharmacy benefit managers. This is intentional. In a competitive market, it would be detrimental to the PBM Defendants' profitability and longevity to share this information with rival, competing PBMs. Yet, through the GoodRx ISP Scheme, the PBM Defendants have effectively agreed to share their confidential and competitively-sensitive reimbursement rates with one another. It is precisely because *all* of the PBM Defendants—horizontal competitors with one another—agreed to share their reimbursement rates that any individual PBM Defendant was willing to as well.

179. Moreover, and more notably, in a fair, competitive market, a pharmacy would decline to join the network of a pharmacy benefit manager that offered the reimbursement rates paid as a result of the GoodRx ISP Scheme. In the absence of the Scheme, the PBM Defendants would have to offer higher reimbursement rates to retain a sufficient pharmacy network. Under the Scheme, however, the PBM Defendants—who process nearly two-thirds of prescription drugs in the country—know that their competitors have also agreed to pay the lowest-negotiated reimbursement rates. Recognizing their collective market dominance, the PBM Defendants engage in anticompetitive behavior without fear that independent pharmacies will decline to join their networks.

180. Several "plus factors" also exist to support Plaintiff's allegations, including (i) the highly concentrated PBM Market, (ii) the high barriers of entry into market, (iii)

Defendants' motives to participate in the ISP Scheme, (iv) product homogeneity; and (v)
the opportunity for inter-competitor communications.

181.   First, the PBM services market is highly concentrated. As described in detail
above, the PBM Defendants process over 60 percent of all prescription drug claims in the
U.S. The six largest pharmacy benefit managers, including three of the PBM Defendants,
process over 90 percent of all prescription drug claims. According to the Herfindahl-
Hirschman Index, a key indicator used by the Federal Trade Commission and U.S.
Department of Justice to measure market concentration, the PBM market is highly
concentrated, with an HHI of 1972.[52] For reference, the 2023 U.S. Department of Justice
and FTC Merger Guidelines define a "highly concentrated market" as one with an HHI
greater than 1800. The PBM market is highly concentrated, horizontally and vertically
integrated, and wields an outsized influence in the prescription drug supply chain.

182.   Second, there are high barriers to entry in the PBM market. Pharmacy
benefit managers are involved in nearly every stage of the prescription drug industry.
They contract with health plans, drug manufacturers, and pharmacies. A new pharmacy
benefit manager would face near insurmountable hurdles including, *inter alia*, finding
clients; developing relationships with manufacturers and health insurance plans;
developing the software and technological systems required to compete against

---

[52] Dima M. Qato, et al., *Pharmacy Benefit Manager Market Concentration for
Prescriptions Filled at US Retail Pharmacies*, 332 JAMA 1298-99 (2024).

behemoths such as CVS Caremark, Express Scripts, and OptumRx; and navigating a dizzying array of state and federal regulations.

183.   Third, the Defendants each have financial motives to engage in the ISP Scheme. The PBM Defendants benefit by paying decreased reimbursement rates to independent pharmacies and by collecting additional fees that they may not otherwise have been permitted to retain. GoodRx benefits through increased profits as a result of transaction fees charged per prescription. Unlike their traditional discount card, the ISP Scheme provides GoodRx a revenue stream that pharmacies cannot opt out of. Relatedly, by decreasing these rates, the PBM Defendants further engage in self-dealing by steering business to their own pharmacies. In fact, the PBM Defendants often negotiate and contract with insurance companies to ensure that their own mail order pharmacies are supplying and dispensing the drugs needed for participants and beneficiaries of the employer plans.

184.   Fourth, the product—reimbursements for dispensed prescription drugs—is interchangeable between pharmacy benefit managers. The National Drug Code sets a universal identifier for prescription drug claims, used by all pharmacies across the country. The existence of a universal identifier aids GoodRx in its orchestration of the ISP Scheme as each PBM Defendant uses the same identifier in its prescription claims processing.

185.   And fifth, Defendants have ample opportunity for inter-competitor communications. These opportunities include networking events and trade association

meetings, such as Pharmaceutical Care Management Association meetings. Further, many members of the GoodRx Board of Directors have prior employment with the PBM Defendants.

## F.    Relevant Markets

186.   This case involves a horizontal price-fixing arrangement, which is a *per se* violation of the Sherman Act. Accordingly, no market definition is required. However, in an abundance of caution, the relevant market is defined as the market for pharmacies to join pharmacy benefit managers' pharmacy networks. The geographic market is the United States—the PBM Defendants provide pharmacy benefit services nationwide and compete to add pharmacies across the country to their pharmacy networks.

187.   TPPs hire pharmacy benefit managers to administer prescription drug coverage for their covered beneficiaries. PBMs compete for pharmacies to join their networks. In doing so, they make themselves more marketable to TPPs. But for the unlawful conduct alleged herein, the PBM Defendants would compete for pharmacies by offering inducements, such as higher reimbursement rates for prescription medications. Pharmacy benefit managers, including the PBM Defendants, are reliant on pharmacies to provide prescription drugs to their clients' members. Because the vast majority of individuals receive prescription drug coverage through a health insurer, and therefore have their prescription drug coverage administered by a pharmacy benefit manager, pharmacies, including Plaintiff, are reliant on the business provided by their contractual relationships with pharmacy benefit managers. Given the highly concentrated PBM

market and the PBM Defendants' substantial market power, pharmacies, including Plaintiff, cannot decline to transact with the PBM Defendants.

## G.    Anticompetitive Effects and Injury to Class Members

188.    Traditionally, PBMs had to compete for pharmacy participation in their networks. An independent pharmacy might prefer to contract with a PBM that reimbursed, for example, $8 for a generic drug, rather than one that only offered $5, because better reimbursement helped the pharmacy stay afloat.

189.    Indeed, in a competitive market, PBMs would try to attract pharmacies by offering higher reimbursement rates for prescriptions than their rivals. Those higher rates could incentivize pharmacies to join a PBM's network and thus make that PBM's insurance plans more attractive to patients (since more pharmacies would accept them).

190.    The ISP Scheme completely undercuts this competitive dynamic. Under the ISP Scheme, none of the PBM Defendants ever has to pay more than the absolute lowest rate any other PBM in GoodRx's network has negotiated. In effect, the PBM Defendants have agreed not to outbid each other on pharmacy reimbursements, ensuring that for every generic prescription, the PBM Defendants always pay the lowest price negotiated by any rival PBM. GoodRx serves as the broker of this agreement.

191.    By sharing real-time pricing data and synchronizing their payments to pharmacies, the PBM Defendants and GoodRx have eliminated any upward pressure on reimbursement rates that competition might have provided.

192.    Defendants insist that PBMs "don't have access" to each other's negotiated reimbursement rates when they divert claims through the ISP. This claim is misleading and ignores the practical realities of how pharmacy claims are processed.

193.    GoodRx's ISP creates an effective price-sharing mechanism where PBMs know that another PBM has offered a lower rate than its own—and it can adjust accordingly. For example, deductible tracking exposes price differences.

194.    PBMs can infer competitors' rates from how much is applied to a patient's deductible. When a GoodRx ISP transaction occurs, the patient's deductible may be credited with an amount different from what the original PBM would have paid, revealing competitive pricing data. This allows PBMs to adjust their own future rates to match or undercut competitors.

195.    The Bank Identification Number (BIN) on returned claims can also indicate which PBM's network was used for a transaction. The presence of a BIN tied to a specific pricing network makes it trivial for PBMs to deduce their competitors' reimbursement rates.

196.    The ISP scheme drastically reduces reimbursements to pharmacies on a vast scale. Nearly two-thirds of all prescriptions in the U.S. are processed by the PBM Defendants.

197.    With such reach, the ISP's "lowest-of-all" pricing algorithm applies to a huge portion of prescriptions filled nationwide. Independent pharmacies—which operate on thin margins to begin with—find themselves getting paid the lowest rate possible for

almost every generic prescription under the PBM Defendants' plans. They also lose an additional $7–$10 per prescription in fees, which goes directly into the pockets of GoodRx and the PBM Defendants.

198.  Additionally, the ISP does not eliminate or reduce spread pricing—billing plan sponsors at one rate while reimbursing pharmacies at a lower rate, pocketing the difference. Although the ISP focuses on unifying and drastically reducing payments to pharmacies on prescriptions, spread pricing can still occur on top of those reduced reimbursements. For instance, a PBM might charge the plan sponsor more for the prescription than it pays the independent pharmacy under the "lowest-of-all-PBMs" rate. This difference is hidden from both the plan sponsor and the pharmacy.

199.  Consequently, the ISP does not eliminate or reduce the spread; it merely ensures that pharmacies' portion is minimized. PBMs can still turn around and bill employers, insurers, or health plans at a higher rate while paying the pharmacy the ISP's depressed amount. Plan sponsors often end up incurring significantly higher costs—despite the PBM paying the pharmacy below acquisition cost for certain drugs.

200.  The ISP scheme intersects with the PBM's vertical integration, steering, preferred treatment of PBM-affiliated pharmacies, and spread pricing. Large, vertically integrated PBM-pharmacies can recoup or offset losses on generic prescriptions through massive markups on drugs, steer patient traffic away from independent pharmacies into their own networks, and conceal additional profits via spread pricing and claw backs.

201.    Independent pharmacies lack these alternative revenue streams and network advantages. They cannot realistically make up for losses on generic claims by charging themselves 40-times NADAC on drugs. Thus, the ISP's rock-bottom reimbursements fall disproportionately on small community pharmacies, all while vertically integrated PBMs profit from inflated reimbursements and hidden spreads.

202.    This exacerbates an already untenable economic reality for independent pharmacies.

203.    As noted above, local pharmacies were already being reimbursed below their acquisition and labor costs for 75 percent of claims. The GoodRx ISP makes this worse by guaranteeing that 100 percent of generic prescription claims now default to the lowest available PBM rate.

204.    The ISP is effectively a "race to the bottom" algorithm, where every claim is adjudicated at the lowest possible reimbursement, rather than allowing natural competition among PBMs to set varied rates. Through this Scheme, the PBM Defendants have artificially suppressed the reimbursement rates paid to independent pharmacies, including Plaintiff.

205.    The ISP Scheme imposes fees on independent pharmacies for each diverted claim—fees that are now embedded within insurance claims, not just cash transactions. According to financial disclosures, these fees accounted for 73 percent of GoodRx's $554 million revenue in the first nine months of 2023. Prior to the ISP, these fees were outside of insurance regulation. When patients used GoodRx as an external discount card, PBMs

charged pharmacies a fee for processing the claim, but because the claim was categorized as a cash transaction, these fees were not subject to insurance regulations. Now, these fees are embedded in PBM-administered insurance claims.

206.   In summation, GoodRx launched its Integrated Savings Program, created in partnership with PBM Defendants Express Scripts, CVS Caremark, MedImpact, and Navitus, in 2023. The ISP Scheme operates as follows: an individual goes to a pharmacy to purchase their medication and presents their prescription card. Then, the ISP technology, using the confidential information provided to GoodRx by the PBM Defendants, compares the prescription price for each participating PBM Defendant. The lowest price is then applied at the point-of-sale.

207.   The GoodRx ISP Scheme has artificially suppressed the reimbursement rates paid to independent pharmacies, including Plaintiff and the Class, for generic prescription medications.

208.   During the relevant time period, Plaintiff and Class Members submitted reimbursement claims for prescription drugs purchased by the PBM Defendants' covered beneficiaries. Upon information and belief, these drug claims were processed pursuant to the GoodRx ISP Scheme, whereupon the lowest-negotiated reimbursement rate was applied to each claim. As a result of the ISP Scheme, Plaintiff and Class Members received anti-competitive—and therefore artificially low—reimbursement rates and paid additional processing and transaction fees. Plaintiff and Class members were injured as a result of each overpayment pursuant to the GoodRx ISP Scheme.

## V.    CLASS ACTION ALLEGATIONS

209.    Plaintiff brings this action on behalf of itself, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as a representative of the proposed Class. The proposed Class is defined as follows:

> All pharmacies in the United States that were reimbursed by the PBM
>
> Defendants for generic prescription medications pursuant to the GoodRx
>
> Integrated Savings Program.

The proposed Class does not include Defendants, governmental entities, or any entities owned or operated by Defendants, their officers, directors, management, employees, parents, subsidiaries, or their affiliates. For the avoidance of doubt, also excluded from the proposed Class are any pharmacies that are part of the same vertically integrated entity as any Defendant.

210.    The proposed Class is so numerous that joinder is impracticable. There are tens of thousands of pharmacies in the United States who would be members of the proposed Class.

211.    Plaintiff's claims are typical of the claims of the proposed Class Members. Plaintiff and members of the proposed Class suffered the same injuries and were damaged by the same unlawful conduct—the Defendants' violation of Section 1 of the Sherman Act. Plaintiff and all members of the proposed Class received less in reimbursements for generic prescription drugs than they otherwise would have absent Defendants' unlawful conduct.

212.   Plaintiff will fairly and adequately protect the interests of the class. The interests of Plaintiff are not antagonistic to the Class.

213.   Questions of law or fact common to the proposed Class members predominate over questions, if any, that affect only individual members. Questions of law and fact common to the class include, *inter alia*:

A.    Whether Defendants entered into an agreement, contract, combination, or conspiracy to artificially suppress the reimbursement rates paid to pharmacies for generic prescription medications;

B.    Whether Defendants' unlawful conduct was a *per se* violation of Section 1 of the Sherman Act;

C.    Whether Defendants' unlawful conduct injured the members of the proposed Class; and

D.    The proper amount of damages for the proposed Class.

214.   Each Defendant has acted on and refused to act on grounds generally applicable to all members of the proposed Class, such that injunctive and declaratory relief is appropriate with respect to all members of the proposed Class.

215.   Plaintiff's counsel has significant experience with complex class action litigation, including class action antitrust litigation. Plaintiff's counsel has the resources and expertise required to litigate this case.

216.   A class action is the superior method for fairly and efficiently adjudicating the controversy. A class action will permit a large number of similarly situated entities or

individuals to try their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding as a class action, including providing the injured entities or individuals a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in managing this class action.

## VI.    CAUSES OF ACTION

### COUNT ONE —
### Agreement in restraint of trade in violation of section 1 of the sherman antitrust act (15 u.s.c. § 1)

217.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

218.    Section 1 of the Sherman Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1.

219.    Each of the Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, has engaged in and affected interstate commerce because each engaged in some or all of the following activities across state boundaries: the management and provision of PBM services; the transmission and/or receipt of invoices, statements, and payments related to the purchase and reimbursement of generic prescription medications; and/or the negotiation and transmission of contracts related to

70

the price and reimbursement rates provided to independent pharmacies for generic prescription medications.

220.    Defendants have violated Section 1 of the Sherman Act by entering into and engaging in an unlawful contract, agreement, conspiracy, or combination in restraint of trade or commerce through the GoodRx ISP Scheme.

221.    As set forth in detail above, Defendants each knowingly and intentionally agreed to facilitate the GoodRx ISP Scheme and each Defendant has engaged in acts in furtherance of the Scheme. Specifically, Defendants have entered into a horizontal price-fixing agreement to ensure that each PBM Defendant always pays pharmacies, including Plaintiff, the lowest reimbursement rate negotiated by any rival PBM for any particular generic drug. To effectuate this Scheme, Defendants have exchanged confidential and competitively sensitive information for the purpose of suppressing reimbursement rates paid to independent pharmacies for generic prescription medications.

222.    Defendants knowingly agreed to enter into this Scheme, with the intent and goal of artificially reducing the reimbursement rates paid to independent pharmacies to below competitive levels. Defendants each entered into this Scheme for their own financial benefit, and, upon information and belief, each Defendant has benefitted financially from this Scheme.

223.    The conduct of Defendants in furtherance of the GoodRx ISP Scheme described herein was authorized, ordered, or executed by Defendants' officers, agents, directors, employees, and/or representatives during the ordinary course of employment.

224. As a result of the ISP Scheme, the Class, including Plaintiff, have suffered damages as a result of the diminished reimbursement rates paid for dispensed generic prescription medications.

225. The ISP Scheme—a horizontal price-fixing agreement—is a *per se* violation of Section 1 of the Sherman Act.

226. In the alternative, the ISP Scheme is an unlawful violation of Section 1 of the Sherman Act pursuant to the Rule of Reason analysis. The ISP Scheme, for the reasons stated above, has and will continue to have a significant anticompetitive effect in the PBM–Pharmacy market. There are no procompetitive justifications for the conduct involved in the ISP Scheme. Any procompetitive benefits, to the extent they exist, are substantially outweighed by the harmful anticompetitive effects produced as a result of the ISP Scheme.

227. As a direct and proximate result of Defendants' ISP Scheme, Plaintiff and members of the proposed Class have sustained damages, including but not limited to, economic injury to their business and property as a result of artificially suppressed reimbursement rates for generic prescription medications. Unless Defendants' conduct is enjoined, Plaintiff and members of the proposed Class will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

228. Defendants are liable to Plaintiff and the members of the proposed Class for damages in an amount to be proven at trial and as provided for by 15 U.S.C. § 15.

229.    Plaintiff and members of the proposed Class are further entitled to injunctive relief to terminate Defendants' unlawful conduct, as provided for by 15 U.S.C. § 26.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all Class members, prays for entry of judgment against the Defendants for all of the relief requested herein and to which Plaintiff and members of the proposed Class may otherwise be entitled, specifically including but not limited to the following:

A.    A determination that Defendants have violated Section 1 of the Sherman Antitrust Act;

B.    Judgement in favor of Plaintiff and the proposed Class and against the Defendants for damages in an amount to be proven at trial and in accordance with 15 U.S.C. § 15.

C.    Injunctive relief in accordance with 15 U.S.C. § 26, to the effect that Defendants, their affiliates, successors, transferees, assignments, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, agreement, or combination alleged herein in violation of Section 1 of the Sherman Antitrust Act, or from entering into any other contract, agreement, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, or program having a similar purpose or effect;

D.    That Plaintiff and the proposed Class:

1.    Be awarded restitution, damages (including, but not limited to treble damages as permitted by 15 U.S.C. § 15), disgorgement, penalties, and all other legal and equitable relief to which Plaintiff and the proposed Class may be entitled;

2.    Be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

3.    Recover its costs of this action, including its reasonable attorneys' fees; and

4.    Be awarded such other further relief as the case may require and the Court may deem just and proper under the circumstances.

## VIII.  JURY DEMAND

Plaintiff, individually and on behalf of all Class members, demands a trial by jury on all issues so triable.

DATED this 30th day of May, 2025.

**KELLER ROHRBACK L.L.P.**

By *Âs/ Alison E. Chase*
       Alison E. Chase (SBN 226976)
       achase@kellerrohrback.com
       801 Garden Street, Suite 301
       Santa Barbara, CA 93101
       (805) 456-1496, Fax (805) 456-1497

74

David J. Ko, *pro hac vice forthcoming*
dko@kellerrohrback.com
Derek W. Loeser, *pro hac vice forthcoming*
dloeser@kellerrohrback.com
Ryan McDevitt, *pro hac vice forthcoming*
rmcdevitt@kellerrohrback.com
Rachel C. Bowanko, (SBN 345717)
rbowanko@kellerrohrback.com
Vinh Le, *pro hac vice forthcoming*
vle@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
(206) 623-1900, Fax (206) 623-3384

***Attorneys for Plaintiffs***